1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NATEEL SHARMA,

            Petitioner,

  v.

M. ELIOT SPEARMAN,
Warden of High Desert State Prison,

            Respondent.

_____/

No. C 18-03531 WHA

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      In this federal habeas corpus action, pursuant to 28 U.S.C. § 2254, a California prisoner alleges that defense counsel rendered ineffective assistance by: (1) engaging in a racially-based cross-examination with the victim; (2) failing to pursue a *Batson/Wheeler* motion; (3) failing to make timely trial objections; and (4) misunderstanding the law. Petitioner also alleges that the cumulative effect of the above errors requires reversal. For the reasons stated herein, the petition for habeas relief is **DENIED**.

**STATEMENT**

      In September 2011, petitioner Nateel Sharma shot victim Nick Delao in the abdomen with a shotgun. In 2014, an Alameda County jury found him guilty of attempted murder and assault with a firearm. He was sentenced to a long prison term. The facts are taken from the California Court of Appeal's opinion (Dkt. No. 9-20, Exh. 7 at 1–7).

### 1. THE ARGUMENT AT VICTIM DELAO'S HOUSE

The shooting occurred outside of a Hayward home where petitioner, his parents, his grandmother, and his younger sister lived. The prosecution and defense presented substantially different versions of these events. The prosecution relied on the testimony of Victim Delao, Luis Cabada (a mutual friend of petitioner and Victim Delao), and two of petitioner's neighbors. The defense relied on testimony from petitioner, his father, and Angel Villalbazo (petitioner's friend).

On the day of the shooting, Victim Delao spent the day consuming alcohol alone in his home. In the early evening, Cabada and an unnamed friend joined him. Petitioner arrived within the next hour. The four began smoking marijuana and drinking. In total, Victim Delao consumed about seven or eight 40-ounce bottles of malt liquor. He acknowledged that his memory of the events was therefore "a little spotty" (Clerk's Tr. at 540:14–15).

At some point during the evening, the mood changed. Victim Delao and petitioner began to argue. Victim Delao testified that while he couldn't remember the exact reason for the argument, it may have been because he "owed [petitioner] a couple hundred bucks for some weed" (*id.* at 540:19–541:1). In contrast, petitioner testified that the argument started because *he* owed Victim Delao money. Petitioner testified that Victim Delao said, "[Y]ou bitch ass . . . nigga. When you going to pay me my dough[]" (*id.* at 730:22–23).

Victim Delao and Cabada, who was not drunk at the time, both testified that petitioner yelled that he was going to shoot Victim Delao, who subsequently testified that he told petitioner "to go ahead," believing that petitioner would not bring his threat to fruition (*id.* at 649:13–15). Petitioner, however, testified that after Victim Delao demanded money, he smashed an empty 40-ounce bottle, and threatened to kill petitioner and "run up in [his] house and get what's mine" (*id.* at 731:18–19). Petitioner responded that Victim Delao could not enter his home, and Victim Delao asked whether petitioner would shoot him. Petitioner then left, heading toward his home, which was a two-minute walk away.

### 2. THE CONFRONTATION OUTSIDE PETITIONER'S HOME

Petitioner testified that he walked to his home, went to his bedroom and grabbed a shotgun that allegedly belonged to his cousin. He then went to the backyard, shot the gun in the air, and, still holding the gun, walked to the front of his house, where he encountered Angel Villalbazo (*id.* at 732:20–22). Villalbazo instructed petitioner to put the gun back inside the home (and he did), and the pair walked to a nearby park (*id.* at 733:9–12). They then decided to drive to a store, so they headed back to petitioner's home for the car.

Meanwhile, Victim Delao testified that about five minutes after petitioner left, he heard three or four loud noises resembling gunshots, emanating from the direction of petitioner's home. Cabada testified that he also heard several loud sounds that sounded like a shotgun. This prompted Victim Delao to start walking toward petitioner's home, with Cabada and the unnamed friend. Victim Delao also testified that he called petitioner's cell phone and told him to come outside to fight. Victim Delao acknowledged that a match between the two would be unfair because he weighed roughly 300 pounds while petitioner weighed 120 pounds.

Victim Delao testified that once he arrived at petitioner's house, he began pounding on the garage door while yelling at petitioner to come outside. Petitioner's father testified that he heard banging on the garage door. He then testified that he opened the door to ask Victim Delao to leave. Not to be deterred, Victim Delao forced his way into the house. Petitioner's father stated that he and petitioner's mother had to push Victim Delao outside while he punched threatened both of them. Several other witnesses, however, denied that Victim Delao entered petitioner's home or that he even got near the front door. Petitioner's father conceded that his statement to the police, provided on the night of the shooting, never mentioned that Victim Delao entered the home or that Victim Delao assaulted him or his wife.

Petitioner, Cabada, and Villalbazo agreed that petitioner was already outside when Victim Delao arrived at petitioner's home. The witnesses generally agreed that Victim Delao and petitioner confronted each other in the street and exchanged blows, that Victim Delao landed at least one punch, that petitioner dropped his cell phone during the altercation, and that Victim Delao picked up the phone and smashed it on the ground, at which point petitioner ran

into the home. Cabada testified that before petitioner ran inside, he said that he was going to shoot Victim Delao. A neighbor who was present at the scene similarly heard petitioner yell that he was going to get his gun.

Once petitioner was inside, Victim Delao turned to leave. A female neighbor testified that with her encouragement, Victim Delao began walking away. Petitioner's father, however, testified that Victim Delao tried to follow petitioner inside. Petitioner's father testified that, while his son was inside, Victim Delao tried to push his way into the home. Petitioner's father kept pushing Victim Delao back while Victim Delao continued to punch him. He also testified that Victim Delao threatened to burn petitioner's house down. There is no other testimony that corroborates petitioner's father's testimony on these points.

Petitioner testified that after he exchanged blows with Victim Delao, petitioner entered his home. Because he was scared for his father's safety, he retrieved his cousin's shotgun and ran back outside.

### 3. THE SHOOTING

Most witnesses agreed that when petitioner re-emerged from the house, he was holding a shotgun and headed toward Victim Delao. According to Victim Delao, petitioner was back in the street, pointing the shotgun at him, by the time he noticed petitioner. Victim Delao then testified that he became angry, grabbed the shotgun barrel, held it against his stomach, and said, "[Y]ou ain't going to shoot me; you're a bitch" (Clerk's Tr. at 571:23–25). Victim Delao stated that he only used one hand to grab the firearm and did not pull very forcefully. He testified that he then dropped his hands to his side, and told petitioner once more, "[Y]ou ain't going to do it" (*id.* at 574:8–9). A few seconds later, petitioner shot Victim Delao in the stomach, and Victim Delao fell to the ground.

Cabada offered a similar testimony, namely that petitioner approached Victim Delao and put the barrel of the shotgun close to Victim Delao's stomach, who then grabbed the barrel and pulled the gun toward him, declaring that petitioner would not follow through. Cabada stated that Victim Delao's hands were by his side when he was shot.

4

The female neighbor testified that she was standing behind Victim Delao when she saw petitioner run toward him and point the shotgun at his stomach. She did not, however, see Victim Delao pull the shotgun toward himself. She testified that Victim Delao's hands were at his side when the weapon was discharged. A neighbor watching from the window also testified he did not see Victim Delao make any sudden movements or advance toward petitioner before he was shot.

In contrast, petitioner and his father provided testimony suggesting that the shooting was accidental. Petitioner's father testified that he managed to push Victim Delao out to the street and was outside with him by the time petitioner emerged from the home with the gun. Petitioner headed toward Victim Delao. Petitioner's father, who was nearby, grabbed his son's arm and tried to push the shotgun's barrel up toward the sky. Petitioner's father stated that Victim Delao repeatedly goaded petitioner into shooting him while he forcefully pulled the barrel toward his stomach. Petitioner's father moved out of the way as Victim Delao continued to pull the barrel. Petitioner's father heard a loud noise and saw Victim Delao step back and fall. Petitioner similarly testified that before he neared Victim Delao, his father grabbed the gun. Victim Delao, however, pulled on the barrel and the weapon discharged. Petitioner testified that he did not intend to shoot Victim Delao. He said that despite their checkered history, the two were still friends and he merely wanted to scare Victim Delao in order to protect his father.

Victim Delao sustained a major gunshot would to the stomach, causing his intestines to protrude. He eventually received several surgical operations and spent twenty-seven days in the hospital. He ultimately lost the upper and lower intestines, and a section of his colon.

Petitioner testified that after the shooting, he left the shotgun lying in the street and ran back into his home. He instructed his grandmother to call 911 and ran to his backyard, where he hopped the fence and ran to another friend's home. Petitioner then called his sister and

cousin, who picked him up in their cousins's car. A few blocks later, the police apprehended them.[*]

Firearms experts for both the prosecution and defense testified that it was plausible that a shotgun would accidentally discharge if a person had a finger on the trigger while another person pulled on the barrel.

### 4. THE VERDICT AND SENTENCING.

The jury convicted petitioner of one count of attempted murder and one count of assault with a firearm. The jury also found true the allegations that petitioner personally and intentionally discharged a firearm causing great bodily injury during the attempted murder and that he personally used a firearm and inflicted great bodily injury during the assault. The jury found untrue the allegation that the attempted murder was willful, deliberate, and premeditated. The trial judge sentenced petitioner to a total term of twenty-eight years and six months to life in prison, comprised of three years and six months for the attempted murder and twenty-five years to life for the accompanying firearm enhancement. The sentence for the assault and accompanying enhancements was stayed.

### 5. APPEAL AND STATE HABEAS.

Petitioner obtained new counsel to appeal the judgment. On appeal, he raised five ineffective assistance of counsel claims. Respondent contended that petitioner's attempted murder sentence was unauthorized and should be corrected. The California Court of Appeals held that none of petitioner's claims had merit but agreed that the attempted murder sentence was erroneous. The state appellate court vacated the sentence and remanded the matter for re-sentencing (Dkt. No. 9-20, Exh. 7 at 24). Petitioner did not petition for a rehearing. He then filed a petition for review in the California Supreme Court in order to exhaust state remedies for "federal habeas corpus purposes" (*id.*, Exh. 8 at 4). That petition was denied (*id.*, Exh. 9).

---

\* Petitioner's sister was charged with being an accessory after the fact to the attempted murder, and was petitioner's co-defendant during the trial. This order does not discuss the facts relating to her offense because she is not a party to this petition.

**ANALYSIS**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action. Under AEDPA, a district court may not grant a writ of habeas corpus unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Where, as here, the California Supreme Court denied review of petitioner's direct appeal without comment, the Court must look to the last reasoned decision, the state appellate court's decision, as the basis for the state court's judgment. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

A state court decision is "contrary to" Supreme Court authority only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A state court decision is an unreasonable application of Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case" *Id.* at 413. On habeas review, the federal court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

Pursuant to Section 2254, petitioner seeks federal habeas relief, contending that his defense counsel violated his Sixth Amendment right to effective counsel on four grounds: (1) by engaging in a racially-based cross-examination with the victim; (2) by failing to pursue

a *Batson*/*Wheeler* motion; (3) by failing to make timely trial objections; and (4) by misunderstanding the law. Petitioner also alleges that the cumulative effect of the above errors requires reversal.

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL.

An ineffective assistance of counsel claim ("IAC") is a cognizable violation of the Sixth Amendment right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any IAC claim is whether counsel's conduct undermined the proper functioning of the adversarial process such that the trial cannot be said to have produced a just result. *Ibid*. The right to effective assistance of counsel applies whether counsel is retained or appointed. *See Cuyler v. Sullivan*, 446 U.S. 335, 344–45 (1980).

In order to prevail on a Sixth Amendment IAC claim, petitioner must satisfy two prongs. *First*, he must establish that counsel's performance was so deficient that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687–88. *Second*, he must establish that he was prejudiced by counsel's deficient performance, such that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Ibid.*

A doubly deferential judicial review is appropriate in analyzing IAC claims under Section 2254. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). Under *Strickland*, a defense counsel's effectiveness is reviewed with *great deference*, which gives the state courts greater leeway in reasonably applying that rule, thereby "translat[ing] to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Both the performance and the prejudice components of the ineffectiveness inquiry are mixed questions of law and fact, thereby invoking the standard of review set forth in Section 2254(d)(1) — namely, whether the state court decision was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Strickland*, 466 U.S. at 698.

### A.     Defense Counsel's Failure to Pursue a *Batson*/*Wheeler* Motion.

Petitioner posits that trial counsel rendered ineffective assistance by failing to obtain a ruling on an earlier raised *Batson*/*Wheeler* motion challenging the prosecution's exercise of peremptory challenges against two Indian prospective jurors, Venireman Dhapa and Venireman Prasad.  Petitioner contends that this alleged ineffective assistance amounts to a violation of his Sixth and Fourteenth Amendment rights.

The right to make peremptory challenges is an important statutory right that is considered vital to the Sixth Amendment guarantee of an impartial jury trial.  *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000).  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), held that prosecution peremptory challenges to potential jurors solely on account of their race violated the Equal Protection Clause.  This holding has since been extended to encompass cognizable groups beyond race.  *People v. Wheeler*, 22 Cal. 3d 258, 276–77 (1978).  A *Batson* claim is cognizable in a federal habeas petition only if the petitioner objected to the prosecution's use of the peremptory challenges at trial.  *See Haney v. Adams*, 641 F.3d 1168, 1169, 1173 (9th. Cir. 2011).  In California, a party who believes the opponent is using peremptory challenges to excuse jurors on grounds of group bias may raise the point by way of timely motion.  *See Wheeler*, 22 Cal. 3d. at 280 (1978).

*Batson* permits rulings on objections to peremptory challenges under a three-step process.  *First*, the defendant must establish a *prima facie* case that the prosecutor exercised peremptory challenges on the basis of race or religion "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94. *Second*, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a neutral explanation for striking the jurors in question.  *Id.* at 97.  *Third*, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98.  In the context of this IAC claim, the questions to be answered are whether defense counsel's failure to pursue the *Batson*/*Wheeler* motion fell below the "objective standard of

reasonableness under prevailing professional norms," and, if so, whether this deficient

performance prejudiced defendant. *Strickland*, 466 U.S. at 687–88.

During voir dire, the trial judge and parties asked Dhapa several questions after he

indicated that it would be difficult for him to be unswayed by sentiment, conjecture, sympathy,

passion, prejudice, or public opinion. Dhapa explained that it would be difficult because

"[he is] emotional; kind of that [he] get[s] moved easily," though he would "definitely try" to

disregard any sympathy he might feel for either party (Dkt. No. 9-18 at 17:2–4, 24). He later

said that it would be difficult for him to prevent sympathy from influencing his decision, but

promised to do his best (*id.* at 81:11–27).

The following day, Dhapa informed the trial judge that his car had been recently stolen

and had been located a week later. When he'd picked his car up, the police informed him that

the perpetrators had been identified. They'd asked Dhapa if he wished to press charges.

Dhapa had declined to press charges, citing unknown "consequences down the road, not

knowing much about the individuals, [and] how long they might be locked behind bars"

(Dkt. No. 9-17 at 73:19–74:12). Dhapa, however, added that if selected, he would "try to"

follow the law, apply the evidence to the law, and not consider defendant's punishment (*id.* at

74:17–20).

The trial judge then questioned Prasad, focusing mainly on his Hindu faith. Prasad

stated that he was "Hindu by faith" and that he and his wife "go regularly to the temple."

The trial judge asked Prasad whether he would favor petitioner and his sister based on their

common faith. Prasad stated, "I'm [a] strong believer in the Hindu religion . . . . Umm, so I

don't know. I don't think they [sic] being Hindu would affect . . . anything because I'm just

going to follow . . . the law." He further indicated that he would be a fair and impartial juror

(*id.* at 97:10-27; 98:22–24).

The prosecutor similarly focused on Prasad's Hinduism, at length. After Prasad agreed

that he was a religious person, the prosecutor asked whether "Hinduism, as you practice it . . .

[has] any tenets or descriptions in terms of violence or use of violence?" Prasad replied, "The

Hinduism is something which we don't harm anybody . . . then live in peace." He qualified

10

that while that was the practice, he didn't know "whether it [was] a current language or current policy" and that he merely followed what his parents had taught him (*id.* at 112:1–2, 8–9, 23–25).

The prosecutor exercised peremptory challenges against Dhapa and Prasad. An oral *Batson*/*Wheeler* motion was not made at that time, but after the prospective jurors had been dismissed, petitioner's counsel indicated to the trial judge that she intended to bring that motion the following day. The trial judge replied that since both prospective jurors had already been dismissed, the only other remedy would be "to throw out the panel" if a *Batson*/*Wheeler* violation was established (Rep. Tr. 82:8–11; 84:22–85:6). The following day, trial counsel for both petitioner and his sister filed a written *Batson*/*Wheeler* motion on the ground that the prosecutor's peremptory challenges were based on group bias of "Indian Nationals and members of the Hindu Religion in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Section 16 of the California Constitution" (Clerk's Tr. at 481). The day after, the jury, including two other Indian members, was sworn without any ruling on the pending *Batson*/*Wheeler* motion. Later that day, the trial judge asked whether defense counsel planned to pursue the motion. Petitioner's counsel stated that as she understood it, the motion was now "moot" because the panel had been sworn, but stated, "For the record, we would have objected had the jurors not been dismissed . . . before we could file it" (Rep. Tr. at 121:21–26). Defense counsel withdrew the motion.

The state appellate court held that defense counsel's failure to procure a ruling on the *Batson*/*Wheeler* did not constitute ineffective assistance of counsel, reasoning that "any error was harmless because the motion would have failed" (Dkt. No. 9-20, Exh. 7 at 9). The crux of this holding was that "the record does not contain evidence establishing a prima facie case of discrimination" (*ibid.*). As to the alleged religious discrimination, the state appellate court found that the prosecutor's in-depth questioning of Prasad suggested that there was no discriminatory intent by the prosecution. Had there been, the prosecutor would have exercised his peremptory challenge without such thorough questioning. Furthermore, the state appellate court found that inquiring into the nonviolent tenets of Hinduism was appropriate because it

11

revealed whether Prasad may be more inclined to believe petitioner's explanation of the shooting (that it was in self-defense). The state appellate court also found that the record did not support a finding of racial discrimination. Citing *People v. Bonilla*, 41 Cal. 4th 313 (2007) and *People v. Turner*, 8 Cal. 4th 137 (1994), the state appellate court noted that dismissing prospective jurors who belong to the same racial group as the defendant did not sufficiently establish a *prima facie* case of discrimination. Finally, it was noted that two of the jurors impaneled were Indian, which indicated the prosecution's good faith in the use of his peremptory challenges.

This order finds this claim is without merit because petitioner was not prejudiced by the alleged error. It is unlikely that petitioner's counsel would have prevailed on her *Batson/Wheeler* motion had she asked for a ruling. There were reasonable grounds to exclude both prospective jurors. This order finds that the evidence does not give rise to the inference that the prosecutor's use of peremptory challenges against Dhapa and Prasad was purposeful discrimination. Asking Prasad to explain the nonviolent tenets of Hinduism was wholly relevant to determine whether Prasad's religious — by extension, personal — beliefs would prevent him from being an impartial juror. Furthermore, the prosecutor's questions about Hinduism followed similar questions already asked by the trial judge. Because the record fails to give rise to the inference that the prosecutor was motivated by a racial or religious discriminatory purpose, this order finds that the state appellate court reasonably applied the *Strickland* standard when it rejected this claim. Accordingly, habeas relief on this claim is DENIED.

### B. Defense Counsel's Use of a Racial Slur During Cross-Examination of the Victim.

Petitioner, who is of Indian descent, contends that during cross-examination of Victim Delao, petitioner's defense counsel "invite[d] the making of a racial slur," which "badly tarnish[ed] the image of [petitioner] and his lawyer . . . thereby severely diminishing [petitioner's] defense" (Dkt. No. 1 at 20). Specifically, Victim Delao testified on direct that he might have called petitioner a "bitch ass nigga" at some point prior to the physical altercation. After confirming this on cross-examination, defense counsel (who is African American), asked,

"When you look at me today, are you going to ask me if I'm a bitch as [sic] nigga?" (Rep. Tr. at 312:5–6).  Victim Delao, who is Latino, responded, "No."  The prosecution objected that the question was improper and argumentative.  The judge told defense counsel, in the presence of the jury, "That's not proper . . . [y]ou should know better." (*id.* at 312:9–10).  Defense counsel resumed her cross-examination.

The state appellate court declined to decide whether trial counsel's questioning of Victim Delao was improper because petitioner did not sufficiently establish prejudice (Dkt. No. 9-20, Exh. 7 at 15).  Petitioner posits that defense counsel should have "asked for a recess . . . for the Court to individually question the jurors about their ability to continue to be fair and impartial to the Defense," and that "[t]he Jury's reactions would probably have been highly negative toward the Defense" (Dkt. No. 1 at 21).  The state appellate court found that petitioner's contention was speculative, which was insufficient to establish prejudice.  Petitioner, the state court reasoned, also failed to explain why the contested question was more likely to reflect poorly on the defense rather than on Victim Delao, who had employed the racial slur regularly.

This order finds that petitioner has not demonstrated substantial prejudice by counsel's comment, such that "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Given that the racial epithet was part of the *res gestae* of the case, and was used before the jury repeatedly, the slur did not crash into the proceedings unannounced.  It had become a feature of the events in question.  In fact, prior to defense counsel's provocative question, the jury heard the racial slur four times (Rep. Tr. at 283:3, 7–8; 311:24).  In that context, the slur gathered actual meaning relevant to the case and the comment by counsel, while improper, could not have poisoned the proceedings in the same way the same comment would have poisoned one free of such harshness.  Defense counsel's provocative question could not have "shocked the conscience" of a reasonable jury to such an extent that it would have changed the outcome, as petitioner contends (Dkt. No. 1 at 20).  The jury's verdict appears to be strongly supported by the evidence.  The only testimony that corroborates petitioner's version of the events is that of his father.  Having carefully reviewed

the transcript of the direct and cross-examinations prior to defense counsel's provocative question, this order concludes that the state appellate court's holding that the contested question did not prejudice petitioner was a reasonable application of the *Strickland* standard. Accordingly, habeas relief on this claim is **DENIED**.

## C. Defense Counsel's Untimely Objections.

Petitioner contends that defense counsel "made numerous fatally late objections on . . . important issues," which violated his Sixth Amendment right to effective assistance of counsel (Dkt. No. 1 at 24). Petitioner cites to two examples in particular:  (1) failing to object when a deputy was seated next to petitioner while he was testifying, and (2) failing to raise the issue of prosecutorial misconduct after the prosecution's drug related statement was stricken from the record.  For the reasons next stated, federal habeas relief on this ground is **DENIED**.

### *(1) Failing to Object to the Bailiff's Presence.*

Petitioner testified on two different days, and a deputy was seated behind petitioner for part of the second day.  After petitioner completed his testimony, his defense counsel objected to the deputy's presence because it signaled to the jury that petitioner was a threat.  Petitioner's defense counsel did not explain why she failed to raise the objection earlier, while counsel for petitioner's sister stated that by the time he noticed the deputy, the jury had already been assembled, and he did not want to use "time . . . related to get this case out of the way for a sidebar" (Dkt. No. 9-20, Exh. 7 at 16–17).

The deputy, at the trial judge's invitation, explained that it was "agency policy" to seat a deputy next to any defendant in custody.  He further explained that his supervisor allowed petitioner to testify without a deputy on the first day because there was a "severe lack of staff" that day.  The trial judge then decided that the objection had been waived.  Furthermore, counsel for petitioner's sister's explanation for why he failed to make a contemporaneous objection was insufficient.  Defense counsel did not request a cautionary instruction to the jury (*id.* at 17).

The state appellate court declined to determine whether this failure to timely object or request a cautionary instruction constituted deficient performance because it held that petitioner

1　was not prejudiced, as the "record does not demonstrate a reasonable probability of a more

2　favorable outcome had [petitioner's counsel] done so" (*ibid.*).  The state appellate court noted

3　that seating a deputy next to a criminal defendant during his testimony was not an "inherently

4　prejudicial" security measure requiring a "demonstration of extraordinary need."  *People v.*

5　*Stevens*, 47 Cal. 4th 625, 634, 642 (2009).

6　　　　The state appellate court relied on *People v. Hernandez*, 51 Cal. 4th 733 (2011), to find

7　that petitioner was not prejudiced by the bailiff's presence, which held that a trial judge's

8　failure to make an individualized decision regarding a bailiff's presence was harmless because

9　the defendant was monitored by one deputy and was dressed in street clothes.  The state

10　appellate court found that, similar to *Hernandez*, petitioner wore street clothes throughout the

11　trial and the record did not suggest that the deputy displayed any "untoward" behavior.

12　Furthermore, it was noted that the evidence supporting the jury's verdict was strong, especially

13　considering that the testimony of petitioner's father, the only one to corroborate petitioner's

14　testimony, lacked credibility in "many respects" (Dkt. No. 9-20, Exh. 7 at 18).

15　　　　Now, petitioner seeks federal habeas relief on the ground that defense counsel's failure

16　to make a timely objection "deprived him of the opportunity to have the deputy immediately

17　removed from his vicinity and to have a cautionary instruction given" (Dkt. No. 1 at 26).

18　This order finds that defense counsel's failure to timely object to the bailiff's presence and

19　her failure to request a cautionary instruction did not constitute ineffective assistance

20　because petitioner has not demonstrated with reasonable probability that "but for counsel's

21　unprofessional errors, the result of the proceeding would have been different."  *Strickland*,

22　466 U.S. at 694.  The state appellate court reasonably determined that petitioner was not

23　prejudiced by the deputy's presence because the jury's verdict was strongly supported by the

24　multiple testimonies presented by witnesses who corroborated the prosecution's case.  On this

25　basis alone, it is highly unlikely that removing the bailiff and issuing a cautionary instruction

26　would have changed the outcome of the trial.  That the bailiff behaved appropriately and that

27　petitioner wore street clothes throughout the trial further supports the inference that the jury

28

15

was not prejudiced against petitioner, nor was his presumption of innocence compromised by the bailiff's presence.  Accordingly, habeas relief on this claim is **DENIED**.

### *(2)*     *Failing to Timely Raise Prosecutorial Misconduct*.

Before trial, the prosecution filed a motion in limine to admit evidence that petitioner and victim were "involved in the growing of marijuana based out of [petitioner's] garage" to explain the nature of the debt that caused the argument (Clerk's Tr. 483–84).  The trial judge was concerned that admitting this evidence would "paint [petitioner] as . . . an overall bad guy" (Rep. Tr. 110:18–19).  The trial judge ruled that the prosecution could not "mention marijuana," but if defense counsel "open[ed] the door," the prosecution would be able to address it only as it pertained to the nature of the debt (*id.* at 112:3–10, 113:14).

During closing arguments, the prosecutor stated that petitioner's pride was "at stake over a drug debt" (Rep. Tr. at 1528:6–7).  Both petitioner and petitioner's sister's counsel objected, referencing the motion in limine.  Counsel for petitioner's sister moved to strike, which was granted — the trial judge stated, in the presence of the jury, "Yeah.  There was no evidence as to the nature of the debt" (*id.* at 1528:13–17).  Neither defense counsel requested a curative instruction, and the trial judge did not issue one *sua sponte*.  The following day, after the jury was sent to deliberate, petitioner's counsel indicated to the trial judge that the prosecution's reference to a drug debt constituted prosecutorial misconduct, for violating the motion in limine.  The trial judge declined to grant relief, finding that the issue had been waived as not timely raised.  Then, contrary to its earlier assertion, the trial judge stated that there *had* been evidence regarding the nature of the debt.  The trial judge referenced Victim Delao's direct examination, when the prosecution asked Victim Delao whether money was involved in the argument between petitioner.  Victim Delao had answered, "It could have been."  When asked, "[W]hat way could it have been," Victim Delao had testified that he "owed [petitioner] a couple hundred bucks for some weed" (Clerk's Tr. at 540:24–541:1).  Accordingly, the trial judge noted that "[it] would not have given [defense counsel] a mistrial . . . based on the state of the evidence" and that defense counsel could have asked for a curative instruction if desired.

The state appellate court concluded that petitioner's defense counsel's failure to timely raise the issue of prosecutorial misconduct did not constitute ineffective assistance because "the prosecutor's statement was proper," and thus, raising prosecutorial conduct was a meritless issue (Dkt. No. 9-20, Exh. 7 at 19). In response to petitioner's contention that the reference to the drug debt was highly prejudicial because it would lead the jury to believe that petitioner was selling drugs, the state appellate court held that "a prosecutor's statement does not constitute misconduct merely because it may have negatively affected the jury's perception of a defendant" (*ibid.*). Because the state appellate court found that the prosecutor's statement was proper, it concluded that petitioner's counsel's waiver of a "meritless issue" did not constitute ineffective assistance because it did not fall outside the "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687–88.

An attorney need not file a motion that he knows to be meritless on the facts and the law. Put simply, "trial counsel cannot have been ineffective for failing to raise a meritless [motion]." *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). This order finds that the prosecutor's reference to a "drug debt" was not improper. The prosecutor did not introduce evidence related to the alleged grow operation while questioning Victim Delao, nor did he mention marijuana as the heart of the debt. That the victim volunteered this information does not amount to prosecutorial misconduct and did not violate the motion in limine. Beyond that, it is not reasonable to suggest that the outcome of the trial would have changed had petitioner's counsel timely raised this issue. The trial judge explicitly stated that, given the evidence, it would not have declared a mistrial had petitioner's counsel sought one (Rep. Tr. at 1543:1–5).

Considering the record in its entirety and the weight of evidence against petitioner, it is similarly unlikely that the jury would have changed their verdict even if a curative instruction was provided as to the nature of the debt. Contrary to petitioner's contention, the reference to a drug debt does not plausibly warrant the conclusion that petitioner is "a generally dangerous person who sells drugs to young people" (Dkt. No. 1 at 26). Defense counsel's failure to timely raise the issue of prosecutorial misconduct did not constitute deficient performance, nor did it

change the outcome of the verdict. Simply put, the state appellate court's rejection of this claim was reasonable. As such, federal habeas relief on this ground is **DENIED**.

### D. Defense Counsel's Failure to Pursue Attempted Voluntary Manslaughter.

Petitioner advances an IAC claim on the ground that his defense counsel was unaware that attempted involuntary murder did not exist as a theory of homicide, and once corrected, failed to argue that petitioner was guilty only of attempted voluntary manslaughter. As a result of these failures, petitioner received, he says, a considerably longer sentence than he would have had trial counsel argued for a conviction of attempted voluntary manslaughter.

While reviewing the jury instructions, petitioner's counsel asked the trial judge for a special instruction on attempted involuntary manslaughter, citing to *People v. Millbrook*, 222 Cal. App. 4th 1122 (2014). The trial judge expressed doubt as to the legitimacy of defense counsel's theory, noting that the correct theory derived from *Millbrook* was attempted voluntary manslaughter based on heat of passion. Petitioner's defense counsel insisted that *Millbrook* legitimized attempted involuntary manslaughter, but ultimately, she did not provide a special instruction for attempted involuntary manslaughter nor did she include a jury instruction for attempted voluntary manslaughter (Rep. Tr. at 1090:23–1092:6; Clerk's Tr. at 699–701). The jury, however, was instructed on attempted voluntary manslaughter at the prosecution's request (Clerk's Tr. at 698). During her closing argument, petitioner's counsel chose to focus on the theories that petitioner accidentally pulled the trigger or that he acted in self-defense or in defense of his father (Rep. Tr. at 1483:22–27).

During deliberations, the foreperson sent a note to the trial judge which read, "We are unable to reach a decision on the top charge . . . attempted murder. We do all agree to return a unanimous verdict on . . . attempted voluntary manslaughter" (*id.* at 1553:15–20). The jury ultimately convicted petitioner of attempted murder, but did not find that the shooting was willful, deliberate, or premeditated (*id.* at 1571:16–20).

The state appellate court concluded that defense counsel's decision to forego pursuit of the attempted voluntary manslaughter lesser did not constitute IAC because while the action impacted the verdict, petitioner's counsel could have "had a rational tactical purpose in arguing

only theories that would result in [petitioner's] acquittal" (Dkt. No. 9-20, Exh. 7 at 20). Furthermore, the state appellate court noted that defense counsel's tactic could have been to "concentrate on theories that would result in little or no prison time," and that her misunderstanding of *Millbrook* would not be inconsistent with such a tactic (*id.* at 22).

To prevail on an IAC claim, petitioner must show that counsel's performance was deficient, and that this deficient performance prejudiced petitioner such that there was "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. After a careful review of the record, particularly the review of jury instructions and the jury's deliberations, this order finds that defense counsel's misunderstanding of *Millbrook* impacted the outcome of petitioner's conviction. This order, however, also finds that defense counsel's performance was not deficient because a trial attorney has *wide discretion* in making tactical decisions, including foregoing jury instructions inconsistent with trial theory. *See Butcher v. Marquez*, 758 F.2d 373, 377 (9th Cir. 1985). As the state appellate court found, defense counsel's all-or-nothing approach during closing arguments could easily have been part of a strategy to increase the possibility that plaintiff could avoid a conviction altogether. That defense counsel's strategy did not yield a favorable result is not IAC *per se*, especially considering that deference to counsel's tactical decisions in closing arguments is accompanied by a broad range of legitimate defense strategies at the time. *See Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam). Tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Bashor v. Risely*, 730 F.2d 1228, 1241 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

This order sees the possibility that petitioner's counsel avoided attempted voluntary manslaughter because, simply put, this theory would have required her to concede that petitioner voluntarily fired the weapon. Advocating for a conviction of attempted voluntary manslaughter would have prejudiced her defense on the murder charges. Thus, there were legitimate tactical reasons why petitioner's counsel may have failed to pursue the attempted voluntary manslaughter lesser. Considering the doubly deferential review of IAC claims under

19

1    AEDPA, this order finds the state appellate court's rejection of this claim reasonable.

2    Accordingly, habeas relief on this ground is **DENIED**.

3                    **E.    Cumulative Error.**

4         Petitioner contends that even if none of the above alleged errors sufficiently alleges IAC

5    on its own, the cumulative effect of warrants reversal (Dkt. No. 1 at 30).  The state appellate

6    court held that petitioner's cumulative effect argument failed because no definite errors made

7    by petitioner's trial counsel had been identified.  The state appellate court reiterated that

8    "[defense counsel's] failure to argue for a conviction of attempted voluntary manslaughter

9    could have been based on reasonable tactical decision" (Dkt. No. 9-20, Exh. 7 at 23).

10         "[P]rejudice may result from the cumulative impact of multiple deficiencies." *Harris v.*

11   *Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586, F.2d 1325, 1333

12   (9th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 974 (1979)).  This order finds that petitioner's

13   alleged errors, in cumulation, did not "render [petitioner's] proceeding fundamentally unfair."

14   *Ibid*.  The cumulative error, petitioner contends, is based on (1) use of a racial slur during cross

15   examination; (2) failure to timely litigate a *Batson/Wheeler* motion; (3) untimely objections;

16   and (4) failure to pursue a conviction of attempted voluntary manslaughter.  This order finds

17   that these alleged errors, assessed for their cumulative effect, do not meet the prejudice prong of

18   *Strickland* because the cumulative effect does not suggest that "but for counsel's unprofessional

19   errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

20   As previously discussed, the weight of the evidence supports the jury's verdict.  As such, the

21   cumulative effect of the alleged errors is not prejudicial.  This order reiterates that defense

22   counsel's failure to seek a conviction for attempted voluntary manslaughter may have been

23   based on a reasonable strategy and should not be considered in any cumulative effect analysis.

24                          **CONCLUSION**

25         This order finds that the state appellate court's adjudication of each of petitioner's

26   claims relied on a reasonable "application of, clearly established Federal law, as determined by

27

28

the Supreme Court of the United States." 28 U.S.C. § 2254(d). Accordingly, petitioner's claims are **DENIED**. Judgment will be entered separately.

**IT IS SO ORDERED.**

Dated: July 25, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California